UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

UNITED STATES OF AMERICA      )
      )
      )
      )
v.      )    No. 3:07-CR-39
      )    (Jordan / Shirley)
KENNETH DYER, and      )
STACIE GLANCE      )
      )

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court as may be appropriate. This matter came before the Court on Kenneth Dyer's Motion to Suppress Evidence [Doc. 17] and Stacie Glance's Motion to Suppress [Doc. 19]. The government filed a consolidated response to these two motions [Doc. 22]. The parties came before the Court for a suppression hearing on July 12, 2007. Assistant United States Attorney Hugh Ward was present representing the government. Attorney Kim Tollison was present representing Kenneth Dyers, who was also present. Attorney Ursula Bailey was present representing Stacie Glance, who was also present. Police Officer Neal Seal of the Sevierville Police Department testified at the suppression hearing; four exhibits were introduced. The Court took the suppression issues, exhibits, related filings and arguments of counsel under advisement on July 12, 2007.

# I: FACTS

On December 4, 2006, Officer Neal Seals Sevierville Police Department received a telephone call from police Lieutenant Ken Hooper of Jackson County, North Carolina. Lt. Hooper told Officer Seals that a confidential informant (CI) had recently provided information about criminal activity in Sevierville. Officer Seals has served 12 years with the City of Sevierville Police Department, over two years of that time he has been assigned to the Fourth Judicial District Drug Task Force. Officer Seals testified that in his conversation with Lt. Hooper, he learned that the CI had told Rick Buchanan of the Jackson County Sheriff's Office about drug sales made from a rental cabin in Pigeon Forge, Tennessee.

Officer Seals testified that in the December 4, 2006, telephone call he learned a CI had told the Jackson County authorities that he purchased one ounce of methamphetamine for $1,400 at a rental cabin in Pigeon Forge. The CI had reported that during this drug deal a woman he knew as "Spacey Stacy" was present.[1] The CI told authorities that the drug deal transpired in the basement of the rental cabin, that there was a pool table in the basement. The CI also described that a blue Dodge Neon and a gray Ford Ranger were parked outside the cabin at the time. Officer Seals testified that he believes the date given by the CI for the transaction was "a couple of days before the first" of December, although he described it as "within seven days" in his later affidavit for a search warrant because he wanted to protect the identity of the CI. Based on this information, Officer Seals arranged to meet with the Jackson County officers and the CI in Pigeon Forge on December 6, 2006.

---

[1] Officer Seals also testified the CI identified Defendant Stacie Glance as the female at the cabin from photos provided to the CI on December 6, 2006.

At the December 6, 2006, meeting, the CI was shown booking photographs from which he identified the two persons who had sold the methamphetamine as Kenneth Dyer and Stacie Lee Glance (who, as previously noted, he had known only as "Spacey Stacy"). That same day, the CI, Officer Seals, Lt. Hooper and Officer Buchanan went to the rental cabin where he said the drug transaction had taken place, 316 Silver Stone Way. The aforementioned blue Dodge Neon and the gray Ford Ranger the CI had described earlier were parked in front of the cabin.

Later that same day, Lt. Hooper faxed documents to Officer Seals showing that both Kenneth Dyer and Stacie Glance were wanted by authorities in North Carolina in connection with drug charges (including charges for methamphetamine) and other charges there. Also on December 6, 2006, Officer Seals set up surveillance of the rental cabin. He testified that he took up a post at a nearby cabin and watched 316 Silver Stone Way for several hours, but nothing notable happened until a man and woman left the cabin. Officer Seals testified that he identified the man as Kenneth Dyer (previously identified by the CI from the photograph), but that he could only conditionally identify the woman as Stacie Glance.

Based on this information, Officer Seals applied for and obtained a search warrant from Fourth Judicial District Circuit Judge Ben Hooper on December 7, 2006. Officer Seals and three other police officers went to the 316 Silver Stone Way cabin to execute the search warrant that same day. The officers did not want to cause damage to the rental cabin, so they planned to arrest Mr. Dyer and Ms Glance as they left the cabin, then conduct the search. Exhibit 5 was then introduced into evidence, a photograph showing the cabin at 316 Silver Stone Way on the morning of December 7, 2006, before the search warrant was executed. The officers were in two cars.

Officer Seals testified that as Mr. Dyer and Ms Glance left the cabin in the Dodge Neon car, with Mr. Dyer driving. Agent Spoon and Agent Barrett blocked the road and stepped out of their vehicle. These two officers were wearing vests identifying them as police and also verbally identified themselves as police. Officers Seals and Smith pulled in behind the Dodge. As Seals and Smith stepped out, the Dodge rammed into Smith's vehicle and went around the other vehicle. Despite a chase, Mr. Dyer and Ms Glance escaped.

After this, Officer Seals contacted Sunset Cottage Rentals, and spoke with Carolyn Scoffield, the manager of the cabin and explained the situation. Ms Scoffield gave Officer Seals a pass code entry combination for the cabin door and sent a maintenance person to assist the officers getting inside the cabin. When the maintenance person arrived, Officer Seals and Officer Smith first conducted a protective sweep. When the other two officers returned form their unsuccessful efforts to apprehend Mr. Dyer and Ms Glance, the officers conducted the search.

The officers found two safes in the basement of the cabin, along with a pool table. One safe contained 49.5 grams of methamphetamine and over $4,000 in cash. The other safe contained what appeared to be Ms Glance's belongings along with a digital scale, a methamphetamine pipe, rolling papers and two more pipes with residue in them. The maintenance man remained on the scene and changed the pass code to the door when the police had finished searching and were leaving the cabin.

Officer Seals testified that the police then left the scene. After they were gone for several hours, Pigeon Forge Police Department contacted Officer Seals to report that Ms Glance was at the cabin in the Dodge Neon with another person (not Mr. Dyer) trying to get inside the cabin. Officer Seals went to the cabin and arrested Ms Glance, apparently based on the Noth Carolina warrants for

her arrest. Officer Seals testified that the US Marshal Service later apprehended Mr. Dyer in North Carolina.

Officer Seals then testified regarding documents introduced into evidence and identified as exhibits 2, 3, and 4. These demonstrated that Stacie Glance rented this cabin for two periods: November 25 - 29, 2006, and December 3 - 8, 2006.[2] The documents for the November rental indicate two guests stayed in the cabin and listed the license plate numbers for the Dodge Neon and the Ford Ranger. The December documents indicate only Ms Glance stayed in the cabin("0 guests"), and only the license plate for the Dodge Neon was provided. The cabin they stayed in both times was named "Love Bears All."

On cross-examination, Officer Seals testified that he never saw Mr. Dyer leave in the gray Ford Ranger. Although the Ford Ranger was parked in the driveway when the two subjects escaped in the Dodge Neon, the Ford was gone later. Officer Seals testified that during the surveillance of the cabin, he never saw any people other than Mr. Dyer and Ms Glance. Officer Seals confirmed that he had never seen the CI before the meeting on December 6, 2006. Officer Seals has learned through his conversations with Officer Buchanan that the CI had provided valuable information in the past, but Officer Seals did not have any information beyond that characterization. Officer Seals had not met Lt. Hooper or Officer Buchanan before this date, either.

Officer Seals testified that he put all the information he had about this investigation into his affidavit. Officer Seals testified that although he had been told the CI's statement to the North Carolina authorities was that he had been to the cabin just a couple of days before December 1,

---

2 The original rental appears to have been from December 3 - 6, 2006, and that additional days were added for December 6 and 7, 2006, although when, how and by whom was not established at the hearing.

2006, he said in the affidavit that the CI had been to 316 Silver Stone Way within the past seven days.  He explained that he believed he needed to do this to protect the CI's identity.

## II:  ANALYSIS

### A.    Privacy Interest

The government raised the issue of standing in oral argument, although not in its brief (in which standing is only addressed in terms of abandonment.)  As a threshold issue, the Court must determine whether Defendant Dyer and Defendant Glance had a privacy interest in the rental cabin. Fourth Amendment protection also applies to hotel rooms. Hoffa v. United States, 385 U.S. 293, 301 (1966); Stoner v. California, 376 U.S. 483, 490 (1964).   A motel room is a temporary abode containing personal possessions and people have a legitimate and significant privacy interest in the contents of a motel room.

Once "a hotel guest's rental period has expired or been lawfully terminated, the guest does not have a legitimate expectation of privacy in the hotel room or in any article therein of which the hotel lawfully takes possession." United States v. Allen, 106 F.3d 695, 699 (6th Cir. 1997).  Accord United States v. Rahme, 813 F.2d 31, 34 (2d Cir.1987); United States v. Huffhines, 967 F.2d 314, 318 (9th Cir.1992) ("[a] guest in a motel has no reasonable expectation of privacy in a room after the rental period has expired"); United States v. Larson, 760 F.2d 852, 854 (8th Cir.) (although defendant clearly intended to continue occupying motel room, he lacked a reasonable expectation of privacy in a room because he "stayed in his motel room beyond the occupancy period without paying for the next day's rent"), cert. denied, 474 U.S. 849 (1985); United States v. Parizo, 514 F.2d 52, 54 (2d Cir.1975) ("[W]hen the term of a guest's occupancy of a room expires, the guest loses his

exclusive right to privacy in the room. The manager of a motel then has the right to enter the room and may consent to search of the room and the seizure of the items there found").

The evidence offered at the hearing established that the cabin was rented by Stacie Glance for a period from December 3, 2006, through December 8, 2006.[3]  Exhibit 4.  The search was conducted on December 7, 2006.  When the search was conducted, Ms Glance's personal property was discovered.  Ms Glance returned to the cabin later that day, attempting to re-enter as a guest. The Court concludes that Ms Glance had a privacy in the cabin at 316 Silver Stone Way at the time it was searched.

Ms Glance rented the cabin only for herself, according to Exhibit 4.  In contrast to the November rental, she did not list a second cabin guest and did not provide a second vehicle license number.  While Mr. Dyer may have had an expectation of privacy based on facts and circumstances the Court could envision, there is nothing in the record to support this conclusion.  Mr. Dyer did not rent the cabin, he was not listed as a guest, his vehicle was not given as a guest vehicle, and there was no testimony that he had personal belongings inside the cabin.  The defendant has the burden of proving standing in order to assert a Fourth Amendment violation.  United States v. Smith, 263 F.3d 571, 582 (6th Cir. 2001).  Although an "overnight guest" is legally deemed to have an expectation of privacy, Minnesota v. Olsen, 495 U.S. 91, 100 (1990), one who is merely present, even with the consent of the owner / lessee cannot claim such an expectation of privacy, Minnesota v. Carter, 525 U.S. 83 (1998), nor may a casual visitor, United States v. Whitehead, 415 F.3d 583

---

[3]  See fn. 2, however there was no proof entered that the cabin rental had expired or terminated on December 6, 2006, and to the contrary it appears that two days were added.  Thus, the evidence before the Court is that the rental period continued, without lapse, from December 3 through December 8, 2006.

(6th Cir. 2005). Lack of proof on this issue will preclude a finding of standing or a legitimate expectation of privacy. See United States v. Smith, 783 F.2d 648, 650 (6th Cir. 1986); and United States v. Talley, 275 F.3d 560, 563 (6th Cir. 2001). Thus, on the evidence before it, the Court cannot conclude that Mr. Dyer had an expectation of privacy in 316 Silver Stone Way on December 7, 2006. United States v. Sharp, 470 U.S. 675, 682 (1985); Minnesota v. Carter, 525 U.S. 83, 88 (1998); United States v. Williams, 353 F.3d 497, 511 (6th Cir. 2003). Because the Fourth Amendment guarantees only against unreasonable searches and seizures and these rights are personal, the defendant bears the burden of proving that his own Fourth Amendment rights were violated, and that he has "standing," to assert a Fourth Amendment violation. United States v. Salvucci, 448 U.S. 83, 86 (1980); Rakas v. Illinois, 439 U.S. 128, 132 (1978). Accordingly, the Court finds Mr. Dyer has not established that he had standing to challenge the search at issue. Should the District Court disagree with this conclusion, this Court will review Mr. Dyer's arguments in favor of suppression along with Ms Glance's arguments herein.

**B.    Abandonment**

The government argues that even if the defendants held a privacy interest in the rental cabin, they abandoned it when they fled from the cabin when approached by police.

The government asserts Neither Dyer nor Glance have standing because they had abandoned the rental cabin. The government says that before they applied for the search warrant, officers had been conducting surveillance on this rental cabin. While preparing to execute the search warrant, police saw Dyer and Glance leave the premises in a Dodge Neon. The officers attempted to stop the vehicle and defendant Dyer rammed the police cruiser and fled the scene. The police went ahead with execution of the search warrant. The government argues that any property the defendants seek

to suppress was effectively abandoned by these actions. Therefore, because did not have a privacy interest in it any longer, these defendants do not have standing.

Similarly, the government argues that the defendants' privacy interest was terminated by the rental company. The officers contacted the rental company before entering the cabin. A rental agent opened the cabin through an entry key pad. After the search, the rental company, not at the request of law enforcement, changed the entry code which denied access to the defendants.

The defendants argue that their actions did not constitute an abandonment of the rental cabin or its contents. Ms Glance returned some hours later and contacted the rental company for assistance when she could not enter with her pass code. Mr. Dyer and Ms Glance argue that although they allegedly fled from the officers in a car when approached *away* from the cabin, this does not impute an abandonment of the cabin's contents. The rental fees were paid through the following day and Mr. Dyer's vehicle was parked at the cabin. Defendants argue that they were not aware that a search warrant was about to be executed and their flight from the officers does not extend to their temporary abode in the rental cabin.

The Court observes that here can be nothing unlawful in the government's appropriation of abandoned personal property, such as items which have been thrown into the wastebasket in a vacated hotel room. Abel v. United States, 362 U.S. 217, 241 (1960)(citing Hester v. United States, 265 U.S. 57, 58 (1924). Likewise, an item left behind when an occupant vacates a hotel room has been abandoned for purposes of the Fourth Amendment and the person who has so abandoned the item forfeits standing to challenge its seizure. United States v. Battista, 646 F.2d 237, 243 (1981). The question of abandonment is a mixed question of law and fact. However, neither the Sixth

Circuit nor virtually any other court, except as noted herein, has apparently addressed the notion of abandonment of realty or a premises based on fleeing from police officers.

Whether property has been "abandoned," in this sense, does not depend on where legal title rests, or whether one asserting a Fourth Amendment right has a legally enforceable possessory interest in the property; the question, rather, is whether the person claiming the protection of the Fourth Amendment "has a legitimate expectation of privacy in the invaded place." United States v. Oswald, 783 F.2d 663, 666 (6th Cir. 1986)(quoting Rakas v. Illinois, 439 U.S. 128, 143 (1978)). The conduct surrounding the possible abandonment must be viewed in an objective light, given the facts as they were known to the law enforcement officers conducting the search or seizure of the property. Oswald, 783 F.2d at 668. In Oswald, the Sixth Circuit found that the defendant's decision to leave a suitcase in "an unlocked burned-out automobile at the side of a highway in the country can fairly be thought to have a much lower expectation of privacy," contrasted with one who leaves a suitcase in the luggage claim area of an airport, where it might reasonable be expected to be set aside for the eventual claimant in a secure environment. Oswald, 783 F.2d at 667. The Sixth Circuit has held that "a feeble hope of regaining possession [of the abandoned items] is hardly enough to vitiate the finding of abandonment." Oswald, 783 F.2d at 667. The Oswald court cited with approval the holding in a Fifth Circuit case on abandonment, United States v. Williams, 569 F.2d 823 (5th Cir.1978). In Williams, the driver of "a marijuana-laden tractor trailer rig left his trailer in a parking lot, knowing he was under surveillance, and returned four hours later to see if the coast was clear." The Fifth Circuit's conclusion, relayed in the Oswald opinion, was that the driver's "only conceivable purpose in leaving the trailer unguarded and unlocked in the parking area was to rid himself of the vehicle with its incriminating contents." Id. The Williams court described

such a course of action as "transparently an abandonment of the tight grip of ownership;" the abandonment is not negated by "the feeble hope of re-acquisition." Oswald, 783 F.2d at 667 (quoting Williams, 569 F.2d at 826.)  However, the government has cited no case that holds that flight from law enforcement officers constitutes an abandonment of a residence or premises from which they left.  Indeed, this Court has found but one case that seems to imply such a holding, United States v. Levassaeur, 816 F.2d 37 (2nd Cir. 1987).  While only persuasive authority, this Court feels the reasoning of Levassaeur is compelling.  However, given the facts upon which it is based and the holdings therein, the case supports the government's argument as to Mr. Dyer, but not as to Ms Glance.  The facts of that case strongly indicate an intentional abandonment of the house in question, with no intention to return.  Levassaeur also provides that the Court's determination is not limited to what the officers knew at the time, but the issue of abandonment can be based on "subsequently discovered events that support an inference" of abandonment or non-abandonment. Levassaeur, 816 F.2d at 44.  In this case, the actions of Mr. Dyer in apparently not returning, and subsequently fleeing to North Carolina, are quite akin to those in Levassaeur.  However, the actions of Ms Glance, especially her return to the cabin and attempt to regain entry, indicate an intention not to abandon the cabin.  As such, this Court finds and hold that abandonment and lack of standing to raise a Fourth Amendment challenge apply to Mr. Dyer, but not Ms Glance.

The government also argued that the defendants' privacy interest in the cabin was terminated by the actions of the rental company.  The evidence at the hearing established that the rental company changed the cabin's entry code after the search was complete, not before.  There was no indication that the lease of the cabin was terminated.  To the contrary, it appears it was in effect and Ms Glance was charged for the nights of December 7 and 8, 2006.  The Court finds that the actions

of the rental company did not terminate any privacy interest the defendants otherwise held in the cabin.

**C.**     **Search Warrant**

The Fourth Amendment requires probable cause for searches and seizures. U.S. Const. amend. IV.  "Probable cause has been defined as 'reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion.'"  United States v. Padro, 52 F.3d 120, 122-23 (6th Cir.1995) (quoting United States v. Bennett, 905 F.2d 931, 934 (6th Cir.1990)).  "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." United States v. Frazier, 423 F.3d 526, 531 (6th Cir.2005).  Probable cause is based on the totality of the circumstances; it is a "practical, non-technical conception that deals with the factual and practical considerations of everyday life." Id.

When reviewing probable cause, the Court may only look within the four corners of the affidavit.   In determining the sufficiency of any search warrant affidavit, the Court may consider "the evidence that the issuing magistrate had before him only to ensure that he had a substantial basis . . . for concluding that probable cause existed."  United States v. Jones, 159 F.3d 969, 973 (6th Cir. 1998) (quoting Illinois v. Gates, 426 U.S. at 238-39).  In a review of that evidence, the Court is "concerned only with the statements of fact contained in the affidavit."  United States v. Hatcher, 473 F.2d 321, 323 (6th Cir. 1973); accord United States v. Frazier, 423 F.3d 526, 531 (6th Cir. 2005) ("our review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four corners of the affidavit").  Additionally, the Court should give

great deference to a magistrate's determination of probable cause.  United States v. Abboud, 438

F.3d 554, 571 (6th Cir. 2006); United States v. Allen, 211 F.3d 970, 973 (6th Cir.2000) (quoting

Spinelli v. United States, 393 U.S. 410, 419 (1969).

*Reliability of the Confidential Informant*

Defense Position

The defendants argue that there was no indication of the truthfulness of the confidential

informant and that, "mere confirmation of innocent static details is insufficient to support an

anonymous tip. The fact that a suspect lives at a particular location or drives a particular car does

not provide any indication of criminal activity." United States v. Wilhelm, 80 F.3d 116, 120 (4th Cir.

1996).  Glance asserts, "Furthermore, lack of a description of the source of information and its

reliability renders such information to amount to no more than unsubstantiated rumor,"  citing

Illinois v. Gates, 462 U.S. 213 (1983).

Government Position

The government argues that the affidavit establishes the reliability of the informant and that

the police officers corroborated information provided by the confidential informant.   The

government argues  that the police independently corroborated the information of the confidential

informant, thereby shoring up his veracity as to the illegal activity within the cabin.

Findings of Fact and Conclusions of Law

While an affidavit in support of a search warrant must state facts supporting an independent judicial determination that the informant is reliable, those facts need not take any particular form. United States v. Allen, 211 F.3d 970, 975-976 (6th Cir. 2000). The affidavit could state that police corroborated significant parts of the informant's story, "or there could be other indicia of the informant's reliability, such as a detailed description of what the informant observed first-hand, or the willingness of the informant to reveal his or her name. Information need not be legally competent evidence in a criminal trial to be considered in the probable cause determination for a search warrant. Draper v. United States, 358 U.S. 307, 311 (1959). As long as the issuing judge can conclude independently that the informant is reliable, an affidavit based on the informant's tip will support a finding of probable cause." United States v. Jackson, 470 F.3d 299, 307 (6th Cir. 2006) (citing Allen, 211 F.3d at 976.) Information from a CI may be corroborated by innocent facts provided by the informant. United States v. Jones, 159 F.3d 969, 974 (6th Cir. 1998). It is not necessary that the police corroborate the criminal conduct itself. Gates, 462 U.S. at 243-44; Alabama v. White, 496 U.S. 325, 331 (1990). Uncertainty regarding the informant's veracity can be compensated for by a strong showing of his basis of knowledge or information that provides detail that can be corroborated. United States v. King, 227 F.3d 732, 743 (6th Cir. 2000).

> "Veracity," "reliability" and "basis of knowledge" are all highly relevant in determining the value of a CI's report. We do not agree, however, that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case.... Rather, ... they should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question whether there is "probable cause" to believe that contraband or evidence is located in a particular place.

United States v. Allen, 211 F.3d 970, 972 -973 (6th Cir. 2000)(citing Gates, 462 U.S. at 230.)

The Court must also consider a statement against penal interest, as made by the CI here, as a traditional veracity consideration.  The Supreme Court has held that if an informant's information tends to be self-incriminating, the declaration against penal interest might be considered sufficient, in and of itself, to establish reliability.  United States v. Harris, 403 U.S. 573 (1971); United States v. Ventresca, 380 U.S. 102 (1965); see also United States v. Farese, 612 F.2d 1376 (5th Cir. 1980), reh'g denied, 616 F.2d 568 (5th Cir. 1980).  In Harris, the court observed:

> Common sense in the important daily affairs of life would induce a prudent and disinterested observer to credit these statements. People do not lightly admit a crime and place critical evidence in the hands of the police in the form of their own admissions. Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility-*sufficient at least to support a finding of probable cause to search*.

Harris, 403 U.S. at 583-584 [emphasis added].

 Here, the CI admitted to the Jackson County authorities, and later to Officer Seal, to making a drug purchase and possession of one ounce of methamphetamine.  The statements he made about Mr. Dyer and Ms Glance directly implicated himself in substantial drug activity.  Providing self-incriminating information about criminal activity, even in hopes of receiving leniency in one's own criminal matters,  carries the indicia of reliability.  United States v. Harris, 403 U.S. 573 (1971); United States v. Czuprynski, 46 F.3d 560 (6th Cir. 1995).  The Court finds that this constitutes a statement against penal interest and imbues the CI in this case with credibility.

In addition to making a self-incriminating statement, this CI provided substantial, "rich" detail in his statement.  The CI described the rental cabin in specific terms, including the fact that

it had a basement with a pool table, and led the police to its location. He also described the two occupants and identified them from photographs. The CI also reported and described specifically two vehicles parked there. The police corroborated the location of the cabin, the presence and identity of the two people described by the CI in the cabin by observing the same cabin on December 6, 2006, when the man identified as Kenneth Dyer emerged with a woman who appeared to be Stacie Glance. The police identified and observed the same two vehicles at the cabin as the CI had described: the same make, model and color, (see exhibit 5.) The affidavit indicates the CI observed the presence of a "large quantity of methamphetamine remaining" after his transaction.

This Court finds that under the totality of the circumstances this confidential informant constituted a reliable source of information to be considered by Judge Hooper. The Court has considered the CI's detailed and specific information about the location of the rental cabin, the two vehicles that would be found parked there and his photo identification of the two persons from whom he purchased the methamphetamine, and the quantity of methamphetamine observed. The Court finds the CI was a credible source of information for probable cause purposes and that in light of the totality of the circumstances, there was a fair probability that evidence of a crime would be found in the cabin.

*Staleness*

<u>Defense Position</u>

Mr. Dyer and Ms Glance argue that the affidavit does not contain sufficient probable cause that a fair probability existed that contraband would be found in the place to be searched because the information was stale in that it was some 14 days old. The defendants argue that the information was supplied by a confidential informant who was unknown to the affiant, Officer Seals, and had no established reliability. Mr. Dyer and Ms Glance argue that the affidavit did not establish a *presently existing* condition that could lead to the conclusion that evidence of narcotics trafficking would be found on December 7, 2007, the date of the search warrant.

<u>Government Position</u>

The government argues that although the affidavit indicates the confidential informant's information may have been as much as 13 days old, it was actually less and that the police corroborated a great deal of the information, and included this in the affidavit for the search warrant. Officer Seals confirmed the two people described by the CI were, in fact, staying at the rental cabin, by conducting surveillance until they were seen leaving the cabin. Officer Seals confirmed the two vehicles described by the CI were also there.

<u>Findings of Fact and Conclusions of Law</u>

The facts adduced at the hearing were that when Officer Seals was first made aware of the tip, the drug transaction had been made less than seven days earlier. Officer Seals applied for, and executed, a search warrant for 316 Silver Stone Way within three days of his initial information. That time was used to meet with the out-of-state CI and law enforcement, to locate the cabin,

identify the occupants, confirm their status as fugitives from North Carolina and to corroborate the information received from the informant through surveillance and observation.

The probable cause inquiry gauges the likelihood that evidence of crime would *presently* be found at a certain location, the rental cabin. A search warrant may not be based upon stale information, and there must be probable cause to believe that the items sought are still located at the place to be searched. A search warrant must be supported by "facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." Sgro v. United States, 187 U.S. 206, 210 (1932). The expiration of probable cause is determined by the circumstances of each case and depends on the inherent nature of the crime. See Sgro,187 U.S. at 210-11, United States v. Henson, 848 F.2d 1374, 1382 (6th Cir. 1988); United States v. Hython, 443 F.3d 480, 485 (6th Cir. 2006). All the information in the affidavit must be taken together when determining sufficiency of probable cause, relying upon Illinois v. Gates, 462 U.S. 213, 230 (1983); United States v. Greene, 250 F.3d 471, 477 (6th Cir. 2001).

Whether information in an affidavit is stale does not depend upon an arbitrary time limitation, but is tied to the nature of the crime, the criminal, the location of the search, and the items sought. United States v. Spikes, 158 F.3d 913, 923-24 (6th Cir. 1998), cert. denied, 525 U.S. 1086 (1999). The factors set out by the Sixth Circuit in Spikes guide this factual assessment. United States v. Spikes, 158 F.3d 913, 923 (6th Cir. 1998); Wayne R. LaFave, Search and Seizure § 3.7(a) at 372 (4th ed. 2004). The variables include: the inherent nature or character of the crime; whether the criminal is nomadic or entrenched; whether the items to be seized are perishable and easily transferable or of enduring utility to the holder; whether the place to be searched is a mere criminal forum of convenience or a secure operational base for criminal conduct.

The inherent nature of the crime of drug trafficking generally weighs generally in favor of limited viability of information about criminal activity, but that is not the case under these facts and circumstances. "Evidence of ongoing criminal activity will generally defeat a claim of staleness." Greene, 250 F.3d at 481. The "sale of drugs out of a residence-is not inherently ongoing. Rather, it exists upon a continuum ranging from an individual who effectuates the occasional sale from his or her personal holdings of drugs to known acquaintances, to an organized group operating an established and notorious drug den." United States v. Hython, 443 F.3d 480, 485 (6th Cir. 2006);)

In this case, the information in the affidavit established that Mr. Dyer and Ms Glance had secured a temporary abode from which to distribute methamphetamine and that they had a large quantity to sell. The affidavit sets forth that both Mr. Dyer and Ms Glance have a history of involvement with narcotics in general and methamphetamine in particular. Specifically, the affidavit says that Mr. Dyer "is wanted in Swain Couny for felony possession of schedule II controlled substance...He is wanted in Buncombe County for feloniously possessing, manufacturing and transporting methamphetamine in excess of 200 grams but less than 400 grams. Stacie Lee Glance is wanted in Swain County for possession of MDMA, a schedule I controlled substance ... [her] criminal history revealed charges of trafficking methamphetamine, possession of drug paraphernalia, and possession of schedule II controlled substance." [Affidavit at ¶ 5]. The fact that they were at the same rental cabin several days after the CI made a substantial drug transaction and had observed the large quantity of methamphetamine in the basement, and their multiple prior drug charges (including methamphetamine charges) suggest there was an ongoing criminal enterprise underway at 316 Silver Stone Way. These facts fall further toward a "notorious drug den" on the Hython continuum, as the same people were still at the same cabin only days later. C.f., United States v.

Hammond, 351 F.3d 765, 772 (6th Cir.2003).

The evidence presented in the affidavit to Judge Hooper suggests that Mr. Dyer and Ms Glance were both somewhat nomadic drug traffickers, and at the same time entrenched in a location where persons ordinarily remain for some extended period. The nature of the alleged crime, however, transient drug sales from a single rental cabin rented for several days at a time, makes this factor weigh against staleness. Had these two persons been located at a different rental cabin, or in a different town, or at their own residence(s), common sense might lead one to conclude that they may have concluded their situational drug enterprise observed at 316 Silver Stone Way. Here, the opposite is true: the two subjects were in precisely the same temporary location where they had been observed several days earlier distributing methamphetamine while in possession of a large quantity of methamphetamine. The logical conclusion to be drawn was that their criminal enterprise was ongoing and that the purpose of their continued cabin rental was their continued sale of drugs.

The items to be seized, narcotics, are of a perishable utility, as compared to other items, such as firearms. However, narcotics are not so perishable that they would be unlikely to remain for several days. In fact, the CI reported that he observed a large quantity of methamphetamine in the cabin, offered for sale. Officer Seal's surveillance of the cabin on December 6, 2007, did not show a great number of potential customers coming and going from the cabin, immediately depleting the quantity of drugs observed by the CI. The Court finds that the CI's information regarding drug trafficking, where a large quantity of drugs was observed, did not become constitutionally stale by the passage of up to 13 days (although probably less than 10), given the facts and circumstances of this case.

The length of time between the events listed in the affidavit and the application for the warrant, "while clearly salient, is not controlling." Spikes. Where the evidence reveals that the criminal activity is "of a continuing nature" the passage of time does not necessarily present a staleness problem. Spikes, 158 F.3d at 924; see also United States v. Henson, 848 F.2d 1374 (6th Cir. 1988), cert. denied, 488 U.S. 1005 (1989) (holding that where some information in an affidavit is stale, a finding of probable cause may still be supported if it relates to protracted or continuous conduct, or if the stale information is corroborated by recent information.). United States v. Word, 806 F.2d 658, 662 (6th Cir. 1986)(probable cause for search warrant existed despite passage of four months since last documented drug sale and 29 day gap between last suspicious event recounted in affidavit and execution of search warrant.); see also United States v. Wright, 343 F.3d 849, 864 (6th Cir.2003) (a factor for evaluating staleness is whether there is "any corroboration of the older and more recent information"); United States v. Johnson, 461 F.2d 285, 287 (10th Cir.1972) (when facts indicate "activity of a protracted and continuous nature, a course of conduct, the passage of time becomes less significant").

Because there was a sufficient basis to support a finding of an ongoing pattern of criminal activity and sufficient recent corroboration that such activity continued at the rental cabin by the same people, the Court concludes that the Spikes factors weigh against a finding of staleness. Judge Hooper was justified in relying on the information contained in the warrant application in finding probable cause and issuing the search warrant. Inasmuch as "the existence of probable cause is a function of the inherent nature of the crime,"a person of reasonable caution, in short, could well have expected to find methamphetamine and items employed in its distribution in the rental cabin on December 7, 2006. United States v. Canan, 48 F.3d 954, 959 (6th Cir. 1995) (quotations omitted);

accord <u>United States v. Chambers</u>, 395 F.3d 563, 572 (6th Cir. 2005).

### III.  CONCLUSION

For the foregoing reasons, the Court respectfully **RECOMMENDS** that Defendant Kenneth Dyer's Motion to Suppress Evidence [Doc.  17] be **DENIED**; and Defendant Stacie Glance's Motion to Suppress [Doc.  19] be **DENIED**. [4]

Respectfully submitted,

   s/ C. Clifford Shirley, Jr.   
United States Magistrate Judge

---

[4] Any objections to this Report and Recommendation must be served and filed with the clerk of the court within ten (10) days after service of a copy of this recommended disposition on the objecting party.  Such objections must conform to the requirements of Rule 72(b), Fed. R. Civ. P.  Failure to file objections within the time specified waives the right to appeal the District Court's order.  <u>Thomas v. Arn</u>, 474 U.S. 140 (1985).  The District Court need not provide <u>de novo</u> review where objections to this report and recommendation are frivolous, conclusive, or general.  <u>Mira v. Marshall</u>, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  <u>Smith v. Detroit Federation of Teachers</u>, 829 F.2d 1370, 1373 (6th Cir. 1987).